IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHERINE MEIGS,

               Plaintiff,

   v.

CARE PROVIDERS INSURANCE
SERVICES, LLC,

               Defendant.

CIVIL ACTION
NO. 21-867

## OPINION

**Slomsky, J.**                                                    **January 13, 2023**

## I.     INTRODUCTION

Plaintiff Katherine Meigs ("Plaintiff") brings this suit against her former employer, Defendant Care Providers Insurance Services d/b/a NSM Insurance Group ("NSM"), alleging sex and/or pregnancy discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Count I), and the Pennsylvania Human Relations Act ("PHRA"), 42 Pa. C.S. § 951, et seq. (Count III).  (Doc. No. 1.)  Plaintiff also alleges that Defendant interfered with her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., and retaliated against her for invoking her FMLA rights (Count II).  (Id.)  In Counts I and III, Plaintiff claims that Defendant terminated her and denied her a promotion because of her sex and pregnancy.  For the alleged violations of Title VII and the PHRA, respectively, she seeks back pay, front pay, and

punitive damages.[1]  (Id. at 13-15.)  For the Count II FMLA violations, Plaintiff seeks back pay,

front pay, and liquidated damages.[2]  (Id. at 14.)

---

[1]  Back pay are damages available to successful Title VII plaintiffs and are "designed to make
victims of unlawful discrimination whole by restoring them to the position they would have
been absent the discrimination."  Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 84 (3d
Cir. 2009) (citing Loeffler v. Frank, 486 U.S. 549, 558 (1988)).  It "is not an automatic or
mandatory remedy, but 'one which the courts may invoke' at their equitable discretion."  Id.
(internal quotation marks omitted) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 415
(1975)).

Under Title VII, front pay is appropriate where the plaintiff did not find better or substantially
equivalent employment.  "'Substantially equivalent' employment affords 'virtually identical
promotional opportunities, compensation, job responsibilities, and status as the position from
which the Title VII claimant has been discriminatorily terminated."  Id. at 85 (quoting Booker
v. Taylor Milk Co., 64 F.3d 860, 866 (3d Cir. 1995)).  Whether Plaintiff's subsequent
employment after her termination from NSM qualifies as "substantially equivalent" is a genuine
dispute of material fact appropriate for determination by a jury.  "[C]ourts may award front pay
where a victim of employment discrimination will experience a loss of future earnings because
she cannot be placed in the position she was unlawfully denied."  Donlin, 581 F.3d at 86.  Front
pay is an award of future earnings and an alternative to reinstatement of the plaintiff at his or
her previous place of employment when reinstatement "would be inappropriate [such as] where
there is a likelihood of continuing disharmony between the parties or unavailable because no
comparable position exists."  Id.  The decision to grant a Title VII claimant an award of front
pay is discretionary.  See id. at 86.

Punitive damages are available under Title VII only "if the complaining party demonstrates that
the respondent engaged in a discriminatory practice or discriminatory practices with malice or
with reckless indifference."  42 U.S.C. § 1981a(b)(1).  An employer acts with "malice" or
"reckless indifference" where it knows "that it may be acting in violation of federal law"
regardless of whether it is aware "that it is engaging in discrimination."  Kolstad v. Am. Dental
Ass'n, 527 U.S. 526, 535 (1999).  Accordingly, punitive damages in Title VII cases are reserved
for "cases in which the defendant's conduct amounts to something more than a bare violation
justifying compensatory damages."  Cochetti v. Desmond, 527 F.2d 102, 106 (3d Cir. 1975).

[2]  A successful plaintiff on a FMLA cause of action is entitled to back pay, front pay,
reinstatement, if appropriate, and liquidated damages.  29 U.S.C. § 2617 provides that any
employer who violates the FMLA is liable to damages to the affected employee in:

> (i) the amount of—
> > (I) any wages, salary, employment benefits, or other compensation denied
> > or lost to such employee by reason of the violation; . . .
> (ii) the interest on the amount described in clause (i) at the prevailing rate; and
> (iii) an additional amount as liquidated damages equal to the sum of the amount
> described in clause (i) and the interest described in clause (ii), except that if an

On November 14, 2022, Defendant NSM filed a Motion for Summary Judgment.  (Doc. No. 67.)  Plaintiff filed a Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 69) and an accompanying Response to Defendant's Statement of Undisputed Material Facts in which she disputes several of NSM's claims of undisputed facts and provided a recitation of the facts in the light most favorable to her (Doc. No. 70).  NSM then filed a Reply. (Doc. No. 71.)  NSM's Motion for Summary Judgment (Doc. No. 67) is now ripe for disposition. For reasons that follow, the Motion for Summary Judgment (Doc. No. 67) will be denied.

In addition to the Summary Judgment Motion, Defendant has filed a Motion to Strike Hearsay Messages, arguing that certain text messages upon which Plaintiff relies to support her discrimination claims are inadmissible hearsay and therefore cannot be relied upon to deny summary judgment.  (Doc. No. 72.)  Defendant also has filed a Motion to Strike Plaintiff's Affidavit, asserting that Plaintiff's self-declaration should be stricken as a "sham affidavit" and not considered at the summary judgment stage.  (Doc. No. 73.)  Plaintiff filed an Omnibus Opposition to Defendant's Motions to Strike.  (Doc. No. 76.)  Defendant filed a Reply.  (Doc. No. 77.)  For reasons that follow, the Motions to Strike (Doc. Nos. 72, 73) will be denied.

---

employer who has violated section 105 proves to the satisfaction of the court that the act or omission which violated section 105 was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 105, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii) . . . .

29 U.S.C. § 2617(a)(1)(A).

Where an employer has not met its burden of good faith compliance with the FMLA under § 2617(a)(1)(A)(iii), any damages assessed against it for lost wages, salary, employment benefits, or other compensation plus interest is doubled.

## II.    BACKGROUND

Plaintiff Katherine Meigs is a female and former employee of NSM.  (Doc. No. 70 at 1.)
NSM has over twenty-five (25) different programs and over 1,000 employees.  (Id. at 3.)  On
August 15, 2016, three months after Plaintiff graduated from college with a bachelor's degree,
NSM hired her as a Business Intelligence Analyst ("BIA") I in the Informational Technology
("IT") Department.  (Id. at 2.)  Her duties as a BIA I included performing various data
manipulations, about which she had limited experience prior to her employment with NSM.  (Id.
at 22.)  Throughout her employment at NSM, Plaintiff reported to Antonio Rosa[3] ("Rosa"), who
headed the IT Department which later became the Strategy and Analytics Department.  Rosa was
the director of this Department, even up until the time of the filing of this lawsuit.  (Id. at 4.)  The
IT Department was converted to the Strategy and Analytics Department after NSM hired in April
or May 2018 Marc Castellucci as Chief Operations Officer ("COO"). [4]

Castellucci testified at his deposition that he observed Plaintiff's job performance within
group meetings between five (5) and twenty (20) times.  (Id. at 6.)  In January 2019, a yearly
review of her performance for 2018 was conducted.  (Id. at 25.)  During the annual review—which
Plaintiff concedes is accurate—Rosa, who conducted and authored the review, informed her that

---

[3]  Plaintiff and Rosa would attend company-sponsored workout classes together.  (Id. at 13.)  They
did so until March or April 2019.  (Id.)  Additionally, in April 2017 and April 2018, Plaintiff
was asked to be a summer intern mentor for the summers of 2017 and 2018.  (Id. at 7.)  She was
not asked to be a summer intern mentor for the summer of 2019.  (Id.)

[4]  Around this same time, NSM was acquired by a public company named White Mountain.  (Id.
at 5.)  As noted, under Castellucci's leadership as NSM's COO, the IT department was replaced
by the Strategy and Analytics Department.  (Id. at 6.)  At the time of its creation, the Strategy
and Analytics Department consisted only of Plaintiff and Rosa who continued to supervise
Plaintiff.  (Id.)

she needed to improve both her soft skills[5] and her relationships.  (Id.)  Plaintiff's annual review also emphasized the areas where Plaintiff excelled.  (Id. at 26.)  To help improve Plaintiff's soft skills, NSM paid for her to attend a two-day public speaking course.  (Id. at 28.)  Additionally, Plaintiff completed a beginner-level course focused on the "R" coding language.  (Id. at 29.)

Although Plaintiff alleges that Rosa told her that he wanted to promote her to Business Intelligence Analyst ("BIA") II, she does not recall Rosa ever telling her that he had discussed any potential promotion with his superiors.  Moreover, Rosa did not tell Plaintiff that it was a given that she would be promoted to BIA II.  (Id. at 36.)  This position is not mentioned in the 2018 Annual Review nor does that review state there was a possibility of Plaintiff being promoted to that position.  (Id.)

As of April 2019, Plaintiff did not inform anyone at NSM that she was pregnant.  (Id. at 13.)  However, in mid-June of 2019, Plaintiff shared news of her pregnancy with two employees: Natalie Miele and Michael Lucci.  (Id. at 20.)  Plaintiff describes them as "close friends."  (Id. at 21.)  Miele and Lucci were not employees in the Strategy and Analytics Department or in the Human Resources Department and were not executives at NSM.  (Id. at 21.)  As far as Plaintiff knows, they followed her instructions not to tell anyone at NSM she was pregnant.  (Id.)

On June 28, 2019, Plaintiff informed Rosa that she was pregnant with her first child, and Rosa appeared to be "visibly shocked" upon hearing the news.[6]  (Id. at 14.)  Rosa was the first person in the Strategy and Analytics Department and the first executive at NSM with whom

---

[5]  Defendant describes "soft skills" as the ability to give effective presentations, speak in public, and communicate effectively.  (Doc. Nos. 67-8 at 101-02; 67-9 at 108; 67-30 at 31-33.)

[6]  Rosa allegedly told Plaintiff that she had "beaten [Rosa] and his wife to having children."  (Id. at 39.)  Rosa made no other comments about Plaintiff's pregnancy.  (Id.)  Plaintiff never reported this comment to Human Resources and never told Rosa that this comment was offensive to her.  (Id.)

Plaintiff shared news of her pregnancy.  (Id. at 19.)  Plaintiff did not inform anyone in Human Resources, including Director Stefan Piocciocchi, about her pregnancy.  (Id. at 19.)  Piocciocchi testified that he did not know Plaintiff was pregnant until after Rosa informed him on July 8 or July 9, 2019.  (Id.; Doc. No. 67-9 at 111.)  Another individual who testified she was not aware of Plaintiff's pregnancy was Megan Noles, a senior account manager at NSM who was later promoted to Account Executive in 2019.[7]  (Doc. No. 70 at 20.)

In February 2019, which was four months prior to Plaintiff's pregnancy announcement to Rosa, Michael Suder was hired as a BIA II in NSM's Strategy and Analytics Department.[8]  (Id. at 8.)  On July 1, 2019, NSM posted an opening for a BIA I.  (Id. at 10.)  Within a year of Plaintiff's termination, NSM hired John McKendry, a former NSM intern, for this position.  (Id. at 11-12.)  On July 2, 2019, NSM posted another opening for the position for a BIA II and hired William Smith in late October 2019.[9]  (Id. at 10.)

Plaintiff received a Midyear Performance Review, dated July 15, 2019, that she claims she did not receive during any other year of her employment at NSM.  (Id. at 26-27.)  She further

---

[7]  Noles worked for NSM for eighteen (18) years and had two pregnancies during her employment, taking maternity leave for each pregnancy.  (Id. at 42.)  She took four months of maternity leave for her first child and was permitted to work on a part-time basis for about a year after she had her second child.  (Id. at 43.)  She testified that NSM was "nothing but good" to her during each of her pregnancies and corresponding maternity leaves.  (Id.)  Noles had joined Plaintiff in her lunchtime workout classes.  (Id. at 20.)

[8]  In May of 2014, Suder received a bachelor's degree in psychology.  (Id. at 37.)  Suder's prior work experience included employment as a BIA for Temple University, an Institutional Research Analyst for the University of Valley Forge, and a Statistical Analyst for the Philadelphia 76ers.  (Id.)  He also was proficient in "R."  (Id.)

[9]  Smith received his Master of Science Degree in, and later was an adjunct professor of, Business Intelligence and Analytics from Saint Joseph's University.  (Id. at 38.)  He was competent in "R," Python, and SQL.  (Id.)  Smith was terminated less than a year after Plaintiff terminated.  (Id.)  Rosa testified that Smith was placed on a performance improvement plan ("PIP") and ultimately was terminated for poor performance.  (Doc. No. 69-6 at 53.)  "He was the first employee that was put on a PIP within the department."  (Doc. No. 70 at 38.)

claims that "[n]o NSM employee aside from [her] received a mid-year review in 2019 because the company did not administer mid-year reviews until 2020 at the earliest." (Id.)  The Midyear Performance Review stated that the overall ratings regarding her performance was "Below Expectations." (Doc. No. 67-32 at 2.)  It also indicated that Plaintiff was late in completing several projects for which she was responsible. (Id. at 3-4.)  Rosa also provided comments at the end of the review stating that Plaintiff:

> [w]orks well with team, and completes support tasks given.  However, would like to see better execution with projects, where not all to do items are laid out.  Must be able to exhibit more proactive behavior to get in front of potential road blocks or future [t]asks [sic].  Has become better with on-time arrival during second quarter.

(Id. at 6.)  At her deposition, Plaintiff testified that she did not receive any other Midyear Performance Review during her employment at NSM. (Doc. No. 69-4 at 44.)

On July 29, 2019, Rosa and Picciocchi, the Human Resources Director, met with Plaintiff and informed her that her employment with NSM was terminated. (Doc. No. 70 at 30.)  Rosa testified that the July 29 meeting was delayed because NSM had a board hearing in the first or second week of July and because Rosa had hernia surgery in early July, which caused him to miss at least one week of work that month. (Id. at 30-31.)  They informed Plaintiff that she was not terminated based on her performance. (Id. at 31.)  Rather, she was being terminated due to strategic organizational restructuring at NSM. (Id.)

After the meeting, Rosa and Picciocchi prepared a written Summary of the Termination Meeting. (Id.)  Rosa "indicated that it was decided to eliminate the level 1 position [of Business Intelligence Analyst], and hire level 2 position with R and/or Python technical abilities now in order to align with company corporate goals of predictive analytics in 2020." (Doc. No. 67-19.)  Plaintiff did not have Python skills when she was terminated. (Doc. No. 70 at 32.)

Plaintiff also was informed that NSM provides letters of recommendation to terminated employees and Rosa "would be happy to be a reference in finding [Plaintiff's] next job." (Id. at 33; Doc. No. 67-19 at 2.) Rosa did write a letter of recommendation for Plaintiff. (See Doc. No. 67-32 at 2.) The letter of recommendation favorably noted Plaintiff's '[E]xcel skills" and her ability to "create[e] robust reports that are visually appealing, allowing users to digest more data than they could otherwise." (Id.) Rosa also stated that Plaintiff "was very customer service oriented, allowing her to build relationships with business users" and that she "also played a pivotal role in NSM Insurance Group's internship program . . . [and] was selected two years in a row to be an intern mentor . . . ." (Id.) The letter did not specifically mention any "R" or Python skills. (Doc. No. 70 at 35.)

Plaintiff alleges that NSMs' FMLA policy was not family-friendly and claims "that NSM acted inappropriately toward three other, former female employees once they became pregnant." (Id. at 40.) Cathy Hunt, NSM's Chief Administrative Officer,[10] oversaw NSM's FMLA scheduling process until 2019, when Human Resources Director Picchiocchi took over the FMLA scheduling process. (Id. at 17-18.) Hunt testified that during her twenty-five years with the company, no employee had ever complained to her about NSM's FMLA leave policy, which she described as generous.[11] (Id. at 42-43.) Plaintiff did not ask Hunt, Picciocchi, or anyone else working in Human Resources about NSM's maternity leave or FMLA policies. (Id. at 18.) Additionally, Rosa testified that he had two employees under his supervision take pregnancy-related FMLA leave. (Id.) As of the date of Rosa' deposition, one was on FMLA leave and the

---

[10]  Hunt served in different positions at NSM from 1994 to 2020. (Id.)

[11]  Hunt also testified that NSM would allow employees to take "an extra week or two" of unpaid leave following an FMLA leave. (Id. at 42.)

other had returned to work after taking three or four months of FMLA leave.  (Id.)  Both women

scheduled and coordinated their FMLA leave with Human Resources.  (Id. at 19.)

Plaintiff identifies three women who were treated inappropriately at NSM.  (Id. at 40.)  The

first woman was Ciara Kwiatkowski, the Director of Marketing.  (Id.)  Kwiatkowski purportedly

told Plaintiff that Geof McKernan, NSM's founder and Chief Executive Officer,[12] assumed she

would only be taking two weeks of maternity leave when she told him she was expecting.  (Id. at

3, 41.)  She also purportedly told Plaintiff that Geof McKernan embarrassed her by asking her

during a team meeting whether the last book she read was related to childcare.  (Id.)  Kwiatkowski

also allegedly told Plaintiff that "it was really hard to work [at NSM]."  (Id.)  Hunt, the Chief

Administrative Officer, testified that she was happy and excited for Kwiatkowski when she

publicized her pregnancy.  (Id. at 41.)  Hunt likely went over NSM's FMLA policy with her.  (Id.

at 42.)

The second employee Plaintiff allegedly spoke to was Jennifer Nolen, an account manager

at NSM.  (Id. at 43.)  Nolen apparently texted Plaintiff that she was trying to move to a different

team within NSM.[13]  (Id.)  According to the text messages, Nolen's manager, who allegedly was

Megan Noles, asked her whether her team knew she was trying to get pregnant and purportedly

stated that "NSM tries not to hire girls [her] age for that reason."  (Id.)  Nolen allegedly told

Plaintiff that she was going to report Noles's comments to Picciocchi.  (Id. at 44.)  Plaintiff

remembers seeing Noles in Piocchiocchi's office, but she did not hear what they said inside the

---

[12] Plaintiff testified that her friend's father is "good friends" with Geof's brother, Bill McKernan.
(Id. at 3.)  Bill McKernan is NSM's President.  (Id.)

[13] Defendant filed a motion to strike these text messages as inadmissible hearsay.  (Doc. No. 72-
1 at 5-7.)

office.  (Id.)  Noles testified, however, that she "would never have said that because I don't believe that."  (Doc. No. 67-13 at 42.)

The third employee Plaintiff allegedly spoke to was Jackie Moke, an underwriter at NSM. (Doc. No. 70 at 45.)  Plaintiff never worked with Moke.  (Id.)  But around August 2, 2019, Plaintiff reached out to Moke to ask her about her pregnancy and maternity leave during her employment with NSM.  (Id.)  Moke allegedly told Plaintiff that she felt that "NSM was not a family friendly environment."  (Id.)  She also said that either Hunt or another member of Human Resources purportedly told Moke that NSM did not "want to give her an increase in her salary because she was taking her [maternity] leave coming up and they [did not] want her to take the money and run[.]"  (Id.)

On October 7, 2019, Plaintiff, who had been terminated at NSM on July 29, 2019, started a new job as a Business Intelligence Analyst with a company named Visiting Angels.  (Id. at 47, 49-50.)  Her starting salary at Visiting Angels was $65,000, and her current salary is "just under $73,000."  (Id. at 47.)  While employed with NSM, Plaintiff's salary was $62,720.63.  (Id.) Plaintiff maintains that her salary would have exceeded $73,000 had she remained at NSM and been promoted to BIA II.  (Id. at 47-48.)  At NSM, Plaintiff had to pay for part of her health insurance coverage, whereas at Visiting Angels, she receives fully paid health insurance.  (Id. at 48.)  Additionally, unlike NSM, Visiting Angels matches 4% of her contributions to her 401(k)-retirement plan.  (Id.)  Plaintiff also has at Visiting Angels fifteen days of paid time off, three personal days, and two sick days.  (Id. at 48-49.)  She did not have personal or sick days at NSM. (Id.)  Plaintiff also works from 9 a.m. until 5 p.m. at Visiting Angels.  (Id. at 49.)  At NSM, she worked from 8 a.m. until 5 p.m.  (Id.)

## III.     STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Hart v. Elec. Arts, Inc., 717 F.3d 141, 148 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  "A dispute 'is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.'" Moody v. Atl. City Bd. of Educ. 870 F.3d 206, 213 (3d Cir. 2017) (citing Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)).  A disputed fact "is material only if it might affect the outcome of the suit under governing law." Id.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Meditz v. City of Newark, 658 F.3d 364, 369 (3d Cir. 2011) (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247–249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could

arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV.    ANALYSIS

Counts I and III of the Complaint allege that Defendant NSM discriminated against Plaintiff because of her gender and/or pregnancy under Title VII and the PHRA respectively.[14] (Doc. No. 1 at 13-15.)  In Count II, Plaintiff alleges that NSM both interfered with and retaliated against her for exercising her rights under the FMLA.  (Id. at 14.)  In particular, she claims that NSM failed to promote her and terminated her shortly after she shared news of her pregnancy with her supervisor, Antonio Rosa.  She also alleges that NSM terminated her after providing NSM with sufficient notice of her intent to exercise her FMLA rights after the birth of her child.  (Id. at 8, 11.)  Furthermore, Plaintiff claims Defendant's behavior was part of a "pattern and practice of discriminating against female employees, pregnant employees, and/or employees who take maternity leave."  (Id. at 11-12.)  Defendant asserts to the contrary that it made the decision to terminate Plaintiff before it knew of her pregnancy and terminated her because the company was restructuring.  (Doc. No. 67-2 at 10-11.)

When viewing Plaintiff's evidence in the light most favorable to her, however, she has raised genuine disputes of material fact.  Thus, NSM's Motion for Summary Judgment will be denied.  But because Plaintiff relies in opposing the Motion for Summary Judgment on several text messages and an email between Plaintiff and NSM employees and on her own affidavit, which

---

[14] Although Plaintiff's claims in Counts I and III arise under both federal and state law, it is appropriate to analyze them together because "the PHRA is interpreted as identical to federal antidiscrimination laws except where there is something specifically different in its language requiring that it be treated differently[.]"  Jones v. SEPTA, 796 F.3d 323, 327 (3d Cir. 2015) (quoting Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002)).

evidence Defendant contends should be stricken, Defendant's Motions to Strike will be considered first.

### A.      Defendant's Motions to Strike Will Be Denied

Defendant filed two Motions to Strike.  In the first Motion, Defendant argues that several text messages purported to be between Plaintiff and NSM employees are inadmissible hearsay and for this reason should be stricken from the summary judgment record.  (Doc. No. 72 at 4.)  In the second Motion, Defendant asserts that this Court should strike Plaintiff's Declaration (Doc. No. 69-10) from the summary judgment record as a "sham affidavit," i.e., one that purports to add facts not supported by the preexisting record in order to defeat a motion for summary judgment.  (Doc. No. 73-1 at 4); see Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) (holding that a litigant cannot "create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict") (citation omitted).  For reasons that follow, both Motions will be denied.

### 1.      Defendant's Motion to Strike the Text Messages Will Be Denied Because They Fall Under an Exception to the Hearsay Rule

Defendant argues that text messages that purport to be between Plaintiff and Jennifer Nolen and an email exchange that purports to be between Plaintiff and Andy Hitz are inadmissible hearsay that do not fall under a hearsay exception and should be excluded from the summary judgment record.[15]  (Doc. No. 72 at 4-7.)  In response, Plaintiff maintains that the text messages and email fall under an exception to the rule against hearsay and properly constitute part of the record.  (Doc. No. 76 at 3-4.)

---

[15]  Plaintiff also included text messages purporting to be between her and Jackie Moke, but Plaintiff agreed "to withdraw this document from the record . . . ."  (Doc. No. 76 at 2.)

Hearsay is a statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Unless provided otherwise by federal statute, the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court," "[h]earsay is not admissible . . . ." Id. 802. "Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009). However, the Third Circuit in F.O.P. v. City of Camden noted as follows:

> "[T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are <u>capable of being admissible at trial</u>." In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. The proponent need only "explain the admissible form that is anticipated."
> . . .
> Here, Plaintiffs identified the third-party declarants, and nothing suggests that those declarants would be unavailable to testify at trial. That is all that was required to survive that aspect of Defendant's motion for summary judgment.

842 F.3d 231, 238-39 (3d Cir. 2016) (footnotes omitted).

Plaintiff's text messages with Nolen and email from Hitz are hearsay; they are out-of-court statements from someone not subject to cross-examination offered to prove the truth of the matter asserted: (1) as to the text messages between Plaintiff and Nolen, that NSM does not have a family friendly policy and has a practice of discriminating against pregnant employees; and (2) as to the email between Plaintiff and Hitz, that the job descriptions for the BIA I and II positions are similar.[16] However, in her Pretrial Memorandum, Plaintiff indicates that Nolen and Hitz will testify at trial. (Doc. No. 75 at 7.) Additionally, Plaintiff also may have Noles testify. (Id.) She reportedly told Nolen that NSM does not hire women Nolen's age because of the prospect of them

---

[16] The BIA I and II job descriptions are in the record and on their own are admissible. The Court has reviewed them and notes their similarity.

becoming pregnant.  (Id.)  Therefore, the Court is satisfied that Plaintiff has "identified the out-of-court declarants . . . and noted their availability to testify."  FOP, 842 F.3d at 238-39.  These persons will testify at trial to the content of the text messages and email.  While the text messages and email themselves may be inadmissible hearsay, their authors will testify at trial about their content.  Therefore, the text messages and email can be considered at the summary judgment stage.  But as the Third Circuit cautioned, this Court does not "intend this ruling to control whether these out-of-court statements will actually be admitted at trial."  Id. at 239.  Accordingly, Defendant's Motion to Strike Hearsay Messages (Doc. No. 72) will be denied.

> **2.  Defendant's Motion to Strike Plaintiff's Declaration Will Be Denied Because Defendant Failed to Elicit Testimony Regarding the Subject Matters Discussed in the Declaration**

In the Motion to Strike Plaintiff's Affidavit, Defendant argues that Plaintiff has submitted a "sham affidavit" that either contradict her deposition testimony and other record evidence or furthers "Plaintiff's own, self-serving beliefs about her qualifications and her position at NSM." (Doc. No. 73 at 4-5.)  Plaintiff counters that Defendant is foreclosed from seeking exclusion of her Declaration because (1) they failed to pursue a line of questioning that would elicit testimony regarding her job description and (2) she was permitted to resolve ambiguities in the record due to Defendant's failure to explore this area.[17]  (Doc. No. 76 at 4-7.)

In Daubert v. NRA Grp., LLC, the Third Circuit explained the sham affidavit doctrine:

> When a nonmovant's affidavit contradicts earlier deposition testimony without a satisfactory or plausible explanation, a district court may disregard it at summary judgment in deciding if a genuine, material factual dispute exists.  See Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991); Jimenez v. All Am. Rathskeller, Inc.,

---

[17]  Plaintiff further argues that Defendants incorrectly rely on the sham affidavit doctrine because sham affidavits only apply to exclude affidavits that clearly contradict that affiant's own testimony.  (See Doc. No. 76 at 5 (citing Ramirez v. Lora, No. 18-11230, 2022 WL 1539176, at *8 (D.N.J. May 16, 2022)).)

503 F.3d 247, 253 (3d Cir. 2007).  This is the sham-affidavit doctrine.  In applying it we adhere to a "flexible approach," <u>Jimenez</u>, 503 F.3d at 254, giving due regard to the "surrounding circumstances," <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004).

If, for example, the witness shows she was "confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact."  <u>Martin v. Merrell Dow Pharm., Inc.</u>, 851 F.2d 703, 705 (3d Cir. 1988); <u>see Jimenez</u>, 503 F.3d at 254.  Same result if there's "independent evidence in the record to bolster an otherwise questionable affidavit."  <u>Baer</u>, 392 F.3d at 625.

The court may, on the other hand, disregard an affidavit when the "affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction."  <u>Martin</u>, 851 F.2d at 706; <u>see Jimenez</u>, 503 F.3d at 254.  It may similarly disregard an affidavit "entirely unsupported by the record and directly contrary to [other relevant] testimony," <u>Jimenez</u>, 503 F.3d at 254, or if it's "clear" the affidavit was offered "solely" to defeat summary judgment, <u>id.</u> at 253; <u>see</u> <u>In re CitX Corp., Inc.</u>, 448 F.3d 672, 679 (3d Cir. 2006); <u>Martin</u>, 851 F.2d at 705.

861 F.3d 382, 391-92 (3d Cir. 2017).  Thus, under the sham affidavit doctrine, to exclude the affidavit two requirements must be met:  (1) "the later statement contradicts the witness's deposition testimony, and [(2)] the discrepancy between the two statements is neither supported by record evidence nor otherwise satisfactorily explained." <u>SodexoMAGIC, LLC v. Drexel Univ.</u>, 24 F.4th 183, 209 (3d Cir. 2022) (citing <u>Daubert</u>, 861 F.3d at 391-92; <u>Jimenez</u>, 503 F.3d at 254).  "But the sham affidavit rule does not reject later statements solely because they conflict with prior deposition testimony" as long as the later statements are "supported by independent record evidence." <u>Id.</u> at 210 (citing <u>Baer</u>, 392 F.3d at 625).

Defendant points to five separate portions of Plaintiff's Declaration it contends contradicts Plaintiff's deposition testimony:  (1) Plaintiff's declaration that she "developed a good understanding of NSM data and all systems utilized by the Company"; (2) various descriptions of

her job duties[18]; (3) Plaintiff's assertion that she had around three "years of experience using SQL [and] using the Power BI data visualization tool"; (4) her statement that she "had an intermediate understanding of Data Warehousing concepts[,] . . . had advanced Excel skills[,] . . . was capable of telling a story using data[,] . . . [and] had an advanced knowledge of DAX"; and (5) her declaration that she "led Excel workshops and training exercises for other NSM employees, including members of the Strategy and Analytics team."  (Doc. No. 73-1 at 5-6 (quoting Doc. No. 69-10 at 2-3.).)  However, for reasons noted below, these statements from Plaintiff's Declaration do not contradict her prior deposition testimony clearly enough to permit this Court to disregard them.

---

[18]  Plaintiff's Declaration describes a number of functions she performed as a BIA I:

> 1.      In my performance of the Business Intelligence Analyst I ("BIA I") role, I analyzed internal/external data sets using SQL Management Studio and visualization tools.

> 2.      In my performance of the BIA I role, I compiled and verified data utilized for periodic scheduled reporting.

> . . .

> 4.      In my performance of the BIA I role, I translated business requirements into technical requirements for enhancements and new custom reports.

> 5.      In my performance of the BIA I role, I developed data extract, transfer and load (ETL) processes via Power Query and SSIS.

> 6.      In my performance of the BIA I role, I performed ad-hoc analysis to find solutions to business inquiries.

> 7.      In my performance of the BIA I role, I performed regular data analysis monitoring to provide prescriptive recommendations based on data.

(Doc. No. 69-10 at 1.)

Defendant's first, third, and fourth objections regarding Plaintiff's skills and experience lacks merit because her Declaration does not clearly contradict her deposition testimony. Regarding the first objection, Defendant argues that because "she only took a beginner-level 'R' course and did not know the Python coding system at the time she was terminated[,]" Plaintiff's Declaration that she "developed a good understanding of NSM data and all systems utilized by the Company" clearly contradicts her earlier testimony. (Doc. No. 73-1 at 5.)  The Court disagrees. While "Plaintiff did not have Python skills when she was terminated[,]" she testified that she had completed the beginner "R" course and was in the process of completing the intermediate level of that course. (Doc. No. 69-4 at 42.)  So although she did not possess skills in every data analysis system in use at NSM, there is still sufficient independent record evidence that she had a "good knowledge" of NSM data and its systems.

Furthermore, regarding the third objection, nothing in Plaintiff's deposition indicates that she did not have had "three years of experience using SQL [and] using the Power BI data visualization tool" solely because she "began her career in NSM's IT Department."  (Doc. Nos. 69-10 ¶¶ 9-10; 67-3 ¶ 35.)  However, although the Strategy and Analytics Department was not yet created when Plaintiff joined NSM, the IT Department was "charged with analytics" and likely used the above-referenced SQL and Power BI data visualization tool.  (Doc. No. 67-30 at 28-30.)

And, regarding the fourth objection, Plaintiff's assertions regarding her Excel skills, Data Warehousing conceptual understanding, verbal and communication skills, and ability to work independently are not contradicted by her earlier deposition testimony.  Defendant instead relies on other witness depositions but does not identify how Plaintiff's Declaration contradicts her own testimony, a necessary requirement under the sham affidavit doctrine.  Thus, Defendant's first,

third, and fourth objections are without merit and Plaintiff's Declaration as to her knowledge of NSM data will not be disregarded.[19]

Defendant's second objection regarding Plaintiff's Declaration refers to several of the duties she performed as a BIA I for NSM.  (See Doc. No. 69-10 at 2.)  While Defendant correctly notes that Plaintiff did not testify about these matters during her deposition, the omissions stem from the fact that Defendant did not ask her questions that would have elicited in more detail her job duties.  Cf. Unzicker v. A.W. Chesterton Co., No. 11-66288, 2015 WL 12941900, at *1 n.1 (E.D. Pa. Feb. 23, 2015).[20]  Rather, as to Defendant's objection to that portion of Plaintiff's Declaration that described her duties, Defendant only cites to Antonio Rosa's deposition testimony, which also is not directly contradicted by Plaintiff's Declaration.  Rosa testified that "the majority of Plaintiff's job duties consisted of 'ad hoc requests[.]'"  (Doc. No. 73-1 at 5 (citing Doc. No. 67-8 at 139).)  Nowhere does Rosa testify that ad hoc requests made up the entirety of Plaintiff's job descriptions; thus, the two statements—the one made by Plaintiff in her Declaration and the one made by Rosa—are not mutually exclusive or contradictory.  Moreover, as noted, Defendant did not question Plaintiff extensively at her deposition on her job duties.

Defendant's fifth objection challenges Plaintiff's assertion that she "led Excel workshops and training exercises for other NSM employees, including members of the Strategy and Analytics

[19]  "[G]aps or minor discrepancies in Plaintiff's testimony [] bear on her credibility and are matters properly reserved for cross-examination."  SodexoMAGIC, LLC v. Drexel Univ., 333 F. Supp. 3d 426, 443 (E.D. Pa. 2018) (quoting Heasley v. Echostar Satellite L.L.C., No. 08-261, 2009 WL 1457733, at *1 (W.D. Pa. May 22, 2009)).  Thus, if this case proceeds to trial, Defendant may cross-examine Plaintiff on her knowledge and familiarity with NSM's data systems.

[20]  In Unzicker, the court declined to strike an affidavit under the sham affidavit doctrine where the defendants "had the opportunity to question Plaintiff about this issue at deposition and, as the deposition testimony reflects, failed to probe enough on this issue to elicit the information that Defendant contends should have been affirmatively disclosed."  Id.  Accordingly, the court there concluded that Plaintiff's affidavit on the issue not implicated in his deposition testimony "merely supplement[ed] (rather than contradict[ed]) Plaintiff's deposition testimony."  Id.

team" as being contradictory to and unsupported by her deposition testimony.  (Doc. No. 73-1 (quoting Doc. No. 60-10 ¶ 14).)  In support of its claim, Defendant relies on Plaintiff's testimony that she cannot recall making a formal presentation.  But Plaintiff's Declaration does not address making formal presentations.  Rather, it supports her deposition testimony that she would lead meetings biweekly.  Because her Declaration does not contradict her deposition testimony, the Court will not disregard her affidavit.  Defendant's Motion to Strike Plaintiff's Affidavit (Doc. No. 73) therefore will be denied and Plaintiff's Declaration (Doc. No. 69-10) will be considered on summary judgment.

**B.**   **A Reasonable Factfinder Could Find That Plaintiff Meigs Has Established a Prima Facie Case of Employment Discrimination Based on Her Sex and Pregnancy**

Title VII prohibits employment discrimination based on race, color, religion, sex, sexual orientation, national origin, age, and disability.  See EEOC v. Allstate Ins. Co., 778 F.3d 444, 448-49 (3d Cir. 2015) (citing 42 U.S.C. § 2000e-2(a); 29 U.S.C. § 623; 42 U.S.C.§ 12112).  Title VII's prohibitions against sex discrimination "is breached 'wherever an employee's pregnancy [or related medical condition] is a motivating factor for the employer's adverse employment action.'"  Doe, 527 F.3d at 364 (alteration in original) (quoting In re Carnegie Ctr. Assoc., 129 F.3d 290, 294 (3d Cir. 1997)).  The Pregnancy Discrimination Act "mandates that employers treat pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability to work."  Id. (citing Carnegie, 129 F.3d at 297)  When, as here, there is no direct evidence of discrimination, a court analyzes a Title VII disparate treatment claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Doe v. C.A.R.S. Prot. Plus, 527 F.3d 358, 364 (3d Cir. 2008).

Under this framework, to establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that:  (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  See Ali v. Woodbridge Twp. Sch. Dist., 957 F.3d 174, 180 (3d Cir. 2020) (citation omitted).  For pregnancy discrimination, the Third Circuit has modified the first element of a prima facie case to "adduce evidence that she was pregnant, and, that the employer knew it."  Doe, 527 F.3d at 365 (citation omitted).  The second and third elements are self-explanatory, and "[t]he fourth element requires that a plaintiff show some nexus between her pregnancy and the adverse employment action."  Id.

At the summary judgment stage, Plaintiff must submit evidence "sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case."  Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (citation omitted).  The Supreme Court has articulated that "[t]he burden in establishing a prima facie case of disparate treatment is not onerous."  Anderson v. Wachovia Mortg., 621 F.3d 261, 270-71 (3d Cir. 2010) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  Indeed, the goal at this stage is to "eliminate [] the most common nondiscriminatory reasons" for the defendant's actions.  Id.

Here, viewing the facts in the light most favorable to Plaintiff, a reasonable factfinder could find that she has established a prima facie case of sex and/or pregnancy discrimination under Title VII.  Specifically, she can show that:  (1) she is a female who was pregnant at the time of her termination[21]; (2) she was qualified for her position at NSM and consistently performed

---

[21]  The parties do not dispute that Plaintiff was pregnant when Defendants terminated her.

satisfactorily; (3) NSM terminated her[22]; and (4) NSM's actions give rise to an inference of intentional discrimination.

NSM first contends that Plaintiff fails to establish a <u>prima facie</u> case for sex and/or pregnancy discrimination.  (Doc. No. 67-2 at 24.)  Specifically, regarding the first element of Plaintiff's prima facie case, NSM asserts that "no one at NSM with any decision-making authority knew that she was pregnant before they decided to terminate her."  (<u>Id.</u>)  Further, as to the third element, NSM argues that "Plaintiff was no longer qualified for even the Business Intelligence Analyst I position, let alone the Business Intelligence Analyst II position for which she claims to have been in line for a promotion."  (<u>Id.</u> at 28.)  Lastly, NSM argues that Plaintiff fails to establish the fourth prong of her prima facie case because she was not treated worse than similarly situated individuals who were not pregnant.  (<u>Id.</u> at 29-31.)  Rather, NSM avers that Plaintiff was terminated because of structural reorganization and that Plaintiff's skill levels did not satisfy the reorganization of her position.  (<u>Id.</u> at 31.)

For her part, Plaintiff has produced evidence to the contrary from which a reasonable factfinder could find that NSM discriminated against her because of her sex and pregnancy.  Specifically, Plaintiff informed her supervisor that she was pregnant on June 28, 2019.  For this reason, she claims that Defendant was aware of her pregnancy when it terminated her one month later, on July 29, 2019. (Doc. No. 69 at 18-19.)  Although Defendant cites text messages that show consideration on an earlier date that Plaintiff would be terminated, a reasonable factfinder nonetheless could find that the official date of termination is relevant to whether Defendant was aware of Plaintiff's pregnancy when it terminated her.  Additionally, Plaintiff submits evidence

---

[22] It is undisputed that NSM terminated Plaintiff and the termination is an adverse employment action.

she believes casts doubt on Defendant's assertion that it was not aware of Plaintiff's pregnancy when it terminated her.  In support, she cites Chief Executive Officer McKernan's testimony that he was not involved in her termination and that he thought that Rosa was considering to "try to do something . . . to see if she's going to perform or, you know, move up."  (Doc. No. 69-5 at 7.)

As for Plaintiff's qualifications under the second prong of her prima facie case, there is sufficient evidence to allow a reasonable factfinder to find that Plaintiff was qualified for both the BIA I and II positions.  In its Motion, Defendant argues that Plaintiff was not qualified for those positions because she did not have enough experience compared to the males who eventually were hired as BIA II's.  (Doc. No. 67-2 at 28-29.)   However, Defendant only provides conclusory assertions that "Plaintiff was no longer qualified for even the Business Intelligence Analyst I position, let alone the Business Intelligence Analyst II position for which she claims to have been in line for a promotion."  (Id. at 28.)

Regardless of whether other candidates had more experience, this argument does not mean that Plaintiff was not qualified for the positions.  Plaintiff's objective qualifications control at the first step of the McDonnell Douglas burden-shifting framework and Defendant's arguments relating to other candidates' qualifications and even restructuring at NSM do not control whether Plaintiff has established a prima facie case of discrimination.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 320 (3d Cir. 2000) ("We have held that while objective job qualifications should be considered in evaluating a plaintiff's prima facie case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to the later stage of the McDonnell Douglas analysis.") (quoting Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990)).

23

Moreover, Plaintiff submitted evidence that her termination occurred under circumstances suggesting an inference of discrimination.  Specifically, within several days after Plaintiff informed Rosa of her pregnancy and intent to take maternity leave upon the birth of her child, NSM twice posted an opening for a BIA I.  (See Doc. Nos. 69-11, 69-13.)  As noted above, Plaintiff avers that she had the skill sets for these jobs based on her prior annual performance reviews and identifies evidence that shows the BIA I and II positions had the same requirements and are almost identical.[23]

Additionally, as further evidence of circumstances giving rise to an inference of discrimination, Plaintiff testified that the 2019 Midyear Review upon which Defendant relied in terminating her was made two weeks after her pregnancy announcement to Rosa.  (Doc. No. 67-4 at 44.)  She had never received a midyear performance review before 2019.  (Id.)  And Rosa provides no explanation why Plaintiff's 2019 Midyear Review is the only review that exists for his team members.  (Id. at 50.)

Furthermore, Plaintiff argues that three other factors weigh in favor of a finding of circumstances that give rise to an inference of pregnancy discrimination:  (1) "the one (1) month temporal proximity between Plaintiff's pregnancy announcement and her termination/failure to be promoted"[24]; (2) following Plaintiff's termination, two non-pregnant employees were hired to fill

---

[23] The only difference between the postings for the BIA I and II positions is an apostrophe. (Compare Doc. No. 69-11 ("The NSM Insurance Group Business Intelligence (BI) Team's goal . . . .", with Doc. No. 69-12 ("The NSM Insurance Group Business Intelligence (BI) Teams goal . . . .").)

[24] As Plaintiff points out, several courts in this District have found that termination of employees who announce their pregnancy to their supervisors approximately one month before their termination is unusually suggestive.  See Dinger v. Bryn Mawr Tr. Co., 2022 WL 6746260, at *10 (E.D. Pa. Oct. 11, 2022) (finding less than one month between employer receiving paperwork indicating plaintiff's absence was due to a pregnancy-related medical condition and employer's termination established sufficient temporal proximity for fourth element of prima

the same Business Intelligence Analyst I position she was hired as; and (3) "Defendant has a demonstrated history of discriminating against pregnant and recently pregnant employees." (Doc. No. 69 at 21-23.)

In consideration of the above, the Court is persuaded that, upon review of the summary judgment record, a reasonable factfinder could find that Plaintiff has established a prima facie case of disparate treatment based on sex and/or pregnancy.

### C.   Genuine Issues of Material Fact Exist as to Whether Defendant NSM's Proffered Legitimate Nondiscriminatory Reason for Terminating Meigs Was Mere Pretext

Under the <u>McDonnell Douglas</u> burden-shifting framework, once a plaintiff has pled a <u>prima facie</u> case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the challenged employment action. <u>See</u> <u>Burton</u>, 707 F.3d at 427. Here, NSM has provided a legitimate nondiscriminatory reason for Plaintiff's termination in response to her claims of sex and/or pregnancy discrimination. Specifically, NSM argues that, even if Plaintiff sufficiently pleads a <u>prima facie</u> case, she cannot succeed on her ultimate burden:

> In contrast to Plaintiff, who was only proficient in SQL, Michael Suder, who had already been working as a Business Intelligence Analyst II since February 2019, was proficient in PL/SQL, R. Microsoft Access, IBM Cognos, and R, *in addition to* SQL. . . .
>
> Meanwhile, William Smith, who was eventually hired as the other Business Intelligence Analyst II, possessed a master's degree in Business Intelligence and Analytics and had nearly a decade of experience in the field, taught Business Intelligence and Analytics at the college level, and was proficient in SQL, Python, and R. . . . John McKendry, who was eventually hired to the newly-upgraded Business Intelligence Analyst I position over eight months after Plaintiff's termination, also knew the "R" and Python coding languages.
> . . .
> Plaintiff was terminated (and could not be promoted) because NSM was undergoing a strategic organizational restructuring due to NSM's recent hiring of Castellucci

facie discrimination case); <u>see also</u> <u>C.A.R.S. Prot. Plus, Inc.</u> 527 F.3d at 369 ("We have held temporal proximity sufficient to create an inference of causality to defeat summary judgment.").

> as its COO and its acquisition by White Mountain. . . . As a result—and despite NSM's efforts to help Plaintiff improve her soft skills, her technical skills, and her relationships with NSM's Directors—Plaintiff was no longer qualified for her recently upskilled Business Intelligence Analyst I position, let alone the higher-level Business Intelligence Analyst II position.

(Doc. No. 67-2 at 28-29, 34.)  Thus, NSM has met its burden of production under step two of the burden-shifting framework.

Finally, if the defendant meets its burden of production, under the last step of the McDonnell Douglas framework, a plaintiff must show that the legitimate reason offered by the defendant is mere pretext for discrimination.  Burton, 707 F.3d at 427 (citing Feuntes v. Chrysler Fin. Corp., 32 F.3d 759, 763 (3d Cir. 1994)).  To survive summary judgment, a plaintiff must

> prove that the employer's reasons for his termination were pretextual.  [Sh]e may do so by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons . . . or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."

In re Tribune Media Co., 902 F.3d 384, 402 (3d Cir. 2018) (citing Feuntes, 32 F.3d at 764).  When proceeding under the first method for casting doubt on the employer's asserted reasons for termination, a plaintiff need not provide evidence that the employer acted with discriminatory intent, but rather only that a genuine dispute of material fact exists on the credibility of the defendant's rationale.  Burton, 707 F.3d at 430.  If the plaintiff's evidence relates to the credibility of the employer's proffered justification, it "must indicate 'such weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons."  Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644-45 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 765).  The Court of Appeals has explained that if the plaintiff produces sufficient evidence to discredit the employer's proffered justification, she need not present

additional evidence of discrimination beyond that submitted to support her prima facie case to survive summary judgment.  Burton, 707 F.3d at 427 (citing Fuentes, 32 F.3d at 764).

Plaintiff seeks to prove that Defendant's proffered legitimate nondiscriminatory reason for terminating her was pretextual under each of the above methods.  Because the record is replete with inconsistent and contradictory reasons for terminating Plaintiff, she has met her burden in showing that a factfinder could reasonably disbelieve Defendant's proffered justification to support a nondiscriminatory termination.  Because this evidence, when viewed in the light most favorable to Plaintiff, undermines Defendant's articulated legitimate reasons for firing her, the second method by which to survive summary judgment at the pretext stage of the McDonnell Douglas framework—showing that a discriminatory reason was more likely than not a motivating factor for Plaintiff's termination—need not be addressed.

As Plaintiff points out, there are significant inconsistencies surrounding her termination such that a reasonable juror could determine that NSM's stated nondiscriminatory reason was pretext for pregnancy discrimination.  For instance, Defendant has not adequately explained whose decision it was to terminate Plaintiff.  In its Answers to Plaintiff's First Set of Interrogatories, Defendant states that McKernan, Harris, Picciocchi, and Rosa were involved in Plaintiff's termination.  (Doc. No. 69-18 at 5-6.)  However, Harris was not employed with NSM at the time Plaintiff was terminated and Picciocchi stated that only McKernan and Rosa made the termination decision.  (Doc. Nos. 69-8 at 9; 69-36 at 32.)  Interestingly, McKernan attributes the decision to terminate Plaintiff to Rosa since McKernan testified that he is only involved in the termination of NSM's executives, while Rosa testified that it was McKernan's decision to terminate Plaintiff.  (Doc. Nos. 69-5 at 6, 12; 69-6 at 23, 31, 33.)  Castellucci, on the other hand, testified that it was

either his or Rosa's decision to terminate Plaintiff. (Doc. No. 69-7 at 15.) Thus, at this point, there remain substantial disputes of material facts even on the issue of who terminated Plaintiff.

There are also triable issues of fact as to when the decision to terminate Plaintiff was made. In Defendants' Answer to an interrogatory request, Plaintiff is referred to her 2019 Midyear Review in response to requests to identify "each and every individual involved in the decision to terminate Plaintiff and **[d]escribe** that individual's role and input into the decision" and to describe how Plaintiff's performance or conduct was "less than satisfactory." (Doc. No. 69-18 at 5-6, 8-9 (emphasis in original).) Defendant's answer indicates that the 2019 Midyear Review played a role in its decision to terminate Plaintiff which necessarily implies that the decision to terminate Plaintiff was not made until after that Review was completed on July 15, 2019, which is over two weeks after Plaintiff informed Rosa of her pregnancy. While Castellucci testified that he or Rosa decided to terminate Plaintiff as early as April of 2019, both Rosa and Picciocchi testified that the termination decision was made on June 23, 2019. These inconsistencies sufficiently raise disputed issues of material fact on the timing of the decision to fire Plaintiff.

Moreover, Defendant also does not appear to present a unified theory of the reason for Plaintiff's termination. NSM's internal spreadsheets showing current and past employees states "Performance" as the reason for Plaintiff's termination. (Doc. No. 69-35 at 3.) In Defendant's Answer to the Complaint before the Pennsylvania Human Rights Commission, Defendant states that the reason for Plaintiff's termination was "restructuring." (Doc. No. 69-34.) Moreover, NSM's responses to Plaintiff's discovery requests state that "Plaintiff was terminated due to an organizational restructuring and because she was underperforming in her role as a Business

Intelligence Analyst." (Doc. No. 69-18 at 5.) However, Rosa, Picciocchi, and Castellucci all testified that Plaintiff was not fired for performance-related reasons.[25]

In addition, Plaintiff also produces evidence that shows that she received positive reviews for her performance prior to her pregnancy announcement and that she was soon expected to assume greater job responsibilities. In the 2018 annual review, Rosa stated that Plaintiff has:

> begun to take on more responsibility and continues to show professionalism while working with Directors and Underwriters. She continued to learn additional technical skills which will help with the overall development of the Analytics team. I look forward to 2019, where Kate will be tasked with becoming an owner of important projects, develop soft skills, and responsible for becoming the liaison for the Program Directors.

(Doc. No. 69-20 at 5.) Moreover, Plaintiff received a merit pay increase of 25%, which Defendant agrees it would not provide to an underperforming employee. In sum, there are sufficient genuine issues of material fact that are suitable for a jury on Plaintiff's Title VII and PHRA sex and/or pregnancy discrimination claims. Therefore, summary judgment on Counts I and III will be denied.

### D.   A Reasonable Factfinder Could Find That Defendant Interfered with Plaintiff's FMLA Rights and Retaliated against Her for Exercising Those Rights

Under the Family Medical Leave Act, employers are prohibited "from retaliating against employees who exercise their rights, refusing to authorize leave, manipulating positions to avoid application of the Act, or discriminatorily applying policies to discourage employees from taking leave." Callison v. City of Phila., 430 F.3d 117, 120 (3d Cir. 2005) (citing 29 C.F.R. § 825.220). In other words, "when employees invoke rights granted under the FMLA, employers may not

---

[25] Notably, Defendant's proffered justifications about NSM's restructuring and elimination of the BIA I position to which Plaintiff was hired is contradicted by Defendant's posting for the BIA I position just three days after Plaintiff announced her pregnancy to Rosa. (Doc. No. 67-9 at 133.)

'interfere with, restrain, or deny the exercise of or attempt to exercise' these rights.  Nor may employers 'discharge or in any manner discriminate against any individual for opposing any practice made unlawful.'"  Capps v. Mondelez Global, LLC, 847 F.3d 144, 151 (3d Cir. 2017) (quoting Ross v. Gilhuly, 755 F.3d 185, 191 (3d Cir. 2014)) (citations and footnotes omitted)). Thus, there are two separate causes of action under the FMLA:  (1) interference and (2) retaliation.

In order to establish a claim of FMLA interference, a plaintiff must establish:

> (1) . . . she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of . . . her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which . . . she was entitled under the FMLA.

Capps, 847 F.3d at 155 (quoting Ross, 755 F.3d at 191-92 (citation omitted)).

To establish a FMLA retaliation claim, which is assessed under the McDonnell Douglas framework at the summary judgment stage, "the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein, 691 F.3d at 301-02 (citing Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508-09 (3d Cir. 2009)).[26]

In Count II, Plaintiff alleges that Defendant both interfered with her FMLA rights and retaliated against her for invoking her right to exercise FMLA leave.  (See Doc. No. 1 at 14.)  In response to both claims, Defendant contends that neither claim defeats summary judgment because

---

[26] There is some overlap between FMLA interference and FMLA retaliation claims.  In Erdman, the Third Circuit held that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Hansler v. Lehigh Valley Hosp. Network, 798 F.3d 149, 159 (3d Cir. 2015) (quoting Erdman, 582 F.3d at 509).  And in Hansler, the Third Circuit reversed the district court's grant of summary judgment where the plaintiff, who "attempted to invoke her right to leave . . . and . . . was fired a few weeks later . . . might be able to show that [the defendant] has a retaliatory motive and that the stated reason for termination was pretextual." Id.

Plaintiff failed to provide adequate notice that she was seeking medical leave before the decision to terminate her was made.  (See Doc. No. 67 at 39-44.)  But for reasons stated below, there are genuine disputes of material fact that preclude summary judgment on Plaintiff's FMLA interference and retaliation claims.  Thus, summary judgment on Count II will be denied.

### 1.    FMLA Interference

Regarding Plaintiff's FMLA interference claim, Defendant argues only that her claim fails because she did not satisfy the fourth and fifth elements—notice and entitlement to FMLA benefits.

As to the fourth element of a FMLA interference claim—notice—in Lichtenstein v. University of Pittsburgh Medical Center, the Third Circuit detailed a plaintiff's burden at the summary judgment stage:

> To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave.  29 U.S.C. § 2612(e)(2).  In doing so, the employee "need not expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.303(b).  When the leave is unforeseeable, the employee's obligation is to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  Id. (emphasis added).  As we have previously noted, this is not a formalistic or stringent standard.  See Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007) . . . .
>
> While the FMLA "does not require an employer to be clairvoyant," Brenneman v. MedCentral Health Sys., 366 F.3d 412, 428 (6th Cir. 2004), this does not mean that employees need to provide every detail necessary for the employer to verify if the FMLA applies.  . . .  This conclusion is dictated by the language of 29 C.F.R. § 825.303(a), which provides that "where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying" (emphasis added).  The regulations thus clearly envision situations where an employee can satisfy her notice obligation without providing enough detailed information for the employer to know if FMLA actually applies.  Accordingly, the "critical test" is not whether the employee gave every necessary detail to determine if the FMLA applies, but "how the information conveyed to the employer is reasonably interpreted."  Sarnowski, 510 F.3d at 402.  How the employee's notice is reasonably interpreted is generally a question of fact, not law.

691 F.3d 294, 303 (3d Cir. 2012).

Plaintiff testified that she told Rosa that she was pregnant and that she "planned to take a leave after the baby was born."[27]  (Doc. No. 69-4 at 41.)  From this testimony, a reasonable jury could find that Plaintiff gave sufficient notice to Defendant prior to her termination that she would take FMLA leave.

Defendant has another argument in support of summary judgment on Plaintiff's FMLA interference claim.  Defendant argues that it more closely resembles a claim for FMLA retaliation, which Defendant contends Plaintiff fails to establish.  Specifically, Defendant avers that Plaintiff cannot state a FMLA interference claim because it did not "refuse[] to authorize FMLA leave, den[y] other benefits to which she was entitled, or discourage[] her from taking FMLA leave by either questioning the timing of her leave, proposing that she work from home instead of taking FMLA leave, or by criticizing her for taking too much leave."  (Doc. No. 67-2 at 40 (citing Hilborn v. Cordaro, No. 03-06-0223, 2007 WL 2903453, at *7 (E.D. Pa. Sept. 28, 2007).)  In essence, Defendant argues that terminating Plaintiff does not constitute FMLA interference because it did not pertain to any official employment decision on the request for FMLA leave.  But the Third Circuit has held otherwise.

"[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."  Hansler v. Lehigh Valley Hosp. Network, 798 F.3d 149, 159 (3d Cir. 2015) (quoting Erdman v. Nationwide Ins. Co.,

---

[27] As noted above, under 29 C.F.R. § 825.303(b), it is not mandated that Plaintiff specifically mention "FMLA" to Rosa.  (Doc. No. 69-4 at 41.)  Moreover, Picchiocchi agreed that if an employee came to HR to request medical leave stating she was pregnant and give an approximate indication of when they would give birth, then that would initiate the process to scheduling leave pursuant to the FMLA.  (Doc. No. 67-9 at 58.)  Although Plaintiff informed Rosa directly and Rosa did not work in the HR Department, he was sufficiently aware that the FMLA leave process initiated once an employee informed him that she was pregnant, what her due date was, and when she "would likely be on leave."  (Doc. No. 67-8 at 78.)

582 F.3d 500, 509 (3d Cir. 2009)).  Several courts have held that termination satisfies the fifth element of FMLA interference claims—denial of FMLA benefits.  See Zelesnick v. Temple Univ. Health Sys., No. 19-5820, 2021 WL 201300, at *10 (E.D. Pa. Jan. 19, 2021) (rejecting the defendants' argument that "where a plaintiff claims that FMLA leave was a reason for termination, the claim must be considered as a claim for retaliation, not interference"); May v. PNC Bank, 434 F. Supp. 3d 284, 303 (E.D. Pa. 2020) (stating that plaintiff's FMLA interference claim that "but-for her termination, she would have been entitled to and would have taken FMLA leave after the birth of her child" was distinct from her FMLA retaliation claim); DeCicco v. Mid-Atl. Healthcare, LLC, 275 F. Supp. 3d 546, 564 (E.D. Pa. 2017) ("The Third Circuit's decision in Erdman instructs that a plaintiff's termination for making a valid request for FMLA leave may constitute interference with his FMLA rights, and Kohler [v. TE Wire & Cable LLC, No. , 2016 WL 885045 (D.N.J. Mar. 8, 2016)] persuasively cautions that summary judgment should be denied where a plaintiff's termination allegedly resulted in benefits being withheld.").

Accordingly, because Plaintiff has demonstrated sufficient evidence that would permit a reasonable jury to find that Defendant interfered with her entitled-to benefits under the FMLA by terminating her before she was able to take FMLA leave, summary judgment on her FMLA interference claim will be denied.

## 2.    FMLA Retaliation

At the summary judgment stage, a FMLA retaliation claim based on circumstantial evidence is assessed under the burden-shifting framework of McDonnell Douglas.  In other words, "[t]o prevail on a retaliation claim under the FMLA, the plaintiff must [initially] prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."  Lichtenstein, 691 F.3d

at 301-02 (citing <u>Erdman</u>, 582 F.3d at 508-09).  It is undisputed that the second element of Plaintiff's FMLA retaliation claim is met here—she was terminated.  And, as noted above, there is sufficient evidence that would permit a reasonable jury to find that Plaintiff had provided adequate notice to Defendant of her intent to exercise FMLA leave.  Thus, only the third element of her FMLA retaliation claim—causation—is at issue here.

> As to the causation prong of FMLA retaliation claims, the Third Circuit has held that:

> To demonstrate a prima facie case of causation, Lichtenstein must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination.  <u>See</u> <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279-81 (3d Cir. 2000).  When the "temporal proximity" between the protected activity and adverse action is "unduly suggestive," this "is sufficient standing alone to create an inference of causality and defeat summary judgment."  <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007).

<u>Lichtenstein</u>, 691 F.3d at 307.

The Third Circuit has not provided a bright-line rule as to what constitutes unduly suggestive temporal proximity, but it has upheld as unduly suggestive adverse employment actions undertaken within one week, and has conclusively held that "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."  <u>LeBoon</u>, 503 F.3d at 232-33.  And where temporal proximity is not unduly suggestive, courts consider the timing alongside "the proffered evidence, as a whole" and ask whether the evidence "may suffice to raise the inference [of retaliation]."  <u>Id.</u> at 232.[28]

---

[28] The evidence a court may consider on temporal proximity for FMLA retaliation claims is similar to the evidence that may be considered for purposes of assessing whether a defendant's proffered reasons for terminating an employee are a pretext for discrimination in violation of Title VII:  "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus."  <u>LeBoon</u>, 503 F.3d at 232-33 (citing <u>Farrell</u>, 206 F.3 at 279-81).

While it is unclear whether one month between Plaintiff's asserted invocation of her FMLA rights and her termination by Defendant is an unduly suggestive temporal proximity, for reasons stated <u>supra</u>, there is sufficient evidence upon which a reasonable jury could find that Defendant's proffered justifications are inconsistent.[29]  Plaintiff therefore has pled a <u>prima</u> <u>facie</u> claim of FMLA retaliation.

Since Plaintiff met her burden in establishing a <u>prima</u> <u>facie</u> FMLA retaliation claim, the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for terminating Plaintiff.  As noted <u>supra</u> in Section III.C., Defendant have met their burden and claim to have terminated Plaintiff because of restructuring at NSM and because she was no longer qualified for either the BIA I or II positions.

And finally, the burden then shifts back to Plaintiff to show that Defendants' proffered non-discriminatory reason for terminating her was mere pretext and that the real reason for her termination was that she had provided notice to Defendants she would be exercising her FMLA rights.  Again, as discussed at length at Section III.C., <u>supra</u>, Plaintiff has offered sufficient evidence that would allow a reasonable jury to disbelieve Defendants' stated reasons for terminating Plaintiff.  First, as noted previously, there are inconsistent and contradictory reasons

---

[29] A discussed in Section IV.C., <u>supra</u>, there are several key inconsistencies pertaining to Plaintiff's termination that, when considered with the one month proximity between Plaintiff's invocation of her FMLA rights and her termination, give rise to an inference of retaliation sufficient to defeat summary judgment.  Notably, there are inconsistencies as to Defendant's reasons for firing Plaintiff, when the decision was made, and who made the decision. Furthermore, a reasonable factfinder could find that after Plaintiff's pregnancy announcement, the introduction of a new midyear performance review after Plaintiff's pregnancy announcement that Defendant relied upon in terminating her was pretext for retaliation.

from multiples sources as to why Plaintiff was terminated,[30] when she was terminated,[31] and by whom she was terminated.[32]  Second, she consistently received positive ratings in her annual performance reviews.  Lastly, Plaintiff received a 25% pay increase which would not have been offered to an underperforming employee.  Thus, since summary judgment also will be denied on Plaintiff's FMLA retaliation claim, the Motion will be denied as to Count II.

### E.  The Court Will Refrain at this Point from Ruling on Plaintiff's Entitlement to Front Pay, Back Pay, and Punitive Damages under Title VII, and Liquidated Damages under the FMLA

In their Motion for Summary Judgment, Defendants also argue that Plaintiff should be limited in how much time for which she should be awarded front pay and back pay.[33]  (See Doc. No. 67-2 at 46-47.)  In addition, Defendants correctly note that liquidated damages are not available under Title VII and that punitive damages are not available under the PHRA or for FMLA interference and FMLA retaliation claims.  (Id. at 47-48.)  The Court will not issue a ruling, however, on whether Plaintiff is entitled to front pay and back pay until after it considers the evidence produced at trial.  Moreover, the Court will allow the jury to decide if punitive damages

---

[30]  Various reasons were provided for Plaintiff's termination:  (1) elimination of the BIA I position; (2) elimination of the BIA I position and performance; (3) performance; (4) restructuring and performance; and (5) restructuring and not performance.

[31]  Rosa and Picciocchi testified that the decision to terminate Plaintiff was made on June 23, 2019.  Castellucci believed the decision was made earlier in April 2019.  And NSM's response to an interrogatory request referred to Plaintiff's 2019 Midyear Review which was completed on July 15, 2019, which suggests the decision to terminate was made on or after July 15, 2019.

[32]  Different individuals and groups of individuals were attributed with the decision to terminate Plaintiff including:  (1) McKernan, Harris, Picciocchi, and Rosa; (2) just Rosa; (3) just McKernan; and (4) either Rosa or Castellucci.

[33]  Specifically, Defendants claim that Plaintiff is only entitled to seek "back pay damages representing her average weekly wage at NSM during the 9-week period in which she was unemployed." (Id. at 47.)  Defendants further argue that Plaintiff should be precluded from seeking front pay in any amount because "she was earning a higher salary and receiving more attractive benefits at her new position at Visiting Angels." (Id.)

are warranted only if the evidence introduced at trial supports it.  And since a liquidated damages award under the FMLA depends upon a determination of the "wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation"—i.e. back pay damages—the Court will also refrain from determining at this time Plaintiff's entitlement to liquidated damages.

## V.   CONCLUSION

For the foregoing reasons, Defendant NSM's Motion for Summary Judgment (Doc. No. 67), Motion to Stay Trial and Trial Deadlines (Doc. No. 68), Motion to Strike Hearsay Messages (Doc. No. 72), and Motion to Strike Plaintiff's Affidavit (Doc. No. 73) will be denied.  An appropriate Order follows.